[Civ. No. 36076. First Dist., Div. Two. Feb. 11, 1975.]

BOARD OF SUPERVISORS OF THE CITY AND COUNTY OF SAN FRANCISCO, Petitioner, v.
ROBERT J. DOLAN, as Clerk, etc., Respondent.

## COUNSEL

Thomas M. O'Connor, City Attorney, and Judith L. Teichman, Deputy City Attorney, for Petitioner.

Richard C. Salladin, David W. Alden and Orrick, Herrington, Rowley & Sutcliffe for Respondent.

## OPINION

KANE, J.—In this mandate proceeding, we are called upon to determine the constitutionality of the Marks-Foran Residential Rehabilitation Act of 1973 (Health & Saf. Code,[1] § 37910 et seq., hereinafter referred to as "the Act"), which authorizes cities, counties, cities and counties, and redevelopment agencies and housing authorities within such cities, counties, and cities and counties, to make long-term, low-interest loans to finance residential rehabilitation in depressed residential areas in order to encourage the upgrading of property in such areas (§ 37911) and to issue bonds for the purpose of financing such residential rehabilitation (§ 37916). This proceeding arose in the following manner:

Pursuant to the authority contained in the Act, the Board of Supervisors of the City and County of San Francisco (hereinafter "City") drafted Ordinance No. 23-74, establishing its Rehabilitation Assistance Program (hereinafter "RAP"), which was enacted into law on January 9, 1974 (ch. 32, San Francisco Admin. Code). On May 20, 1974, the City adopted Resolution No. 377-74 (hereinafter "the bond resolution") which was enacted into law on May 22, 1974, when it was signed by the mayor of the City. The bond resolution authorized the issuance of $8 million in Residential Rehabilitation Revenue Bonds, the proceeds of which are to be used to make long-term, low-interest loans to finance residential rehabilitation in depressed residential areas in order

---

[1] Unless otherwise indicated, all references will be to the California Health and Safety Code.

to encourage the upgrading of properties in such areas, and directed respondent, in his official capacity as clerk of the board of supervisors, to cause the bonds to be printed.

On July 25, 1974, respondent refused to comply with the mandate of the bond resolution, asserting that the issuance of the bonds and the use of bond proceeds as proposed would violate the state Constitution. City thereafter sought to invoke the original jurisdiction of the Supreme Court to compel respondent to take the action directed of him, asserting that the issues presented were of great public importance and required prompt resolution. ■ ■■■ By directing this court to issue the alternative writ requested by petitioner, the Supreme Court necessarily determined that there is no adequate remedy in the ordinary course of law and that this case is a proper one for the exercise of original jurisdiction (*San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 945 [92 Cal.Rptr. 309, 479 P.2d 669]; *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 773 [87 Cal.Rptr. 839, 471 P.2d 487], vacated on other grounds (1971) 403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224]).[2]

■ *Issue: Do the Act and the bond resolution, adopted pursuant to the Act, violate article XIII, section 25, of the California Constitution which prohibits the giving or lending of public moneys to private persons? No.*

■ In passing on the constitutionality of legislation such as that before us, we are governed by certain fundamental rules: "Courts should exercise judicial restraint in passing upon the acts of coordinate branches of government; the presumption is in favor of constitutionality, and the invalidity of the legislation must be clear before it can be declared unconstitutional." (*Dittus* v. *Cranston* (1959) 53 Cal.2d 284, 286 [1 Cal.Rptr. 327, 347 P.2d 671], approved in *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 746 [97 Cal.Rptr. 385, 488 P.2d 953]; see also *Lundberg* v. *County of Alameda* (1956) 46 Cal.2d 644, 652 [298 P.2d 1].)

Article XIII, section 25, of the state Constitution, in pertinent part, provides that "The Legislature shall have no power to give or to lend, or to authorize the giving or lending, of the credit of . . . city and county . . . in aid of or to any person, association, or corporation . . . or to pledge the credit thereof, in any manner whatever, for the payment of the liabilities

[2]A writ of mandate will lie to compel a governmental official to perform a ministerial act such as the issuance of bonds; and in a proceeding brought for that purpose, the validity of the law authorizing such issuance may be determined (*California Educational Facilities Authority* v. *Priest* (1974) 12 Cal.3d 593, 598 [116 Cal.Rptr. 361, 526 P.2d 513]). We take note, however, that section 37964 makes specific provision for the validation of bond issues such as those provided in the bond resolution, and that the City did not avail itself of these statutory procedures.

of any individual, association, municipal or other corporation whatever; nor shall it have power to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever . . . ."

■ Respondent's first contention is that under the terms of the bond resolution the proceeds of the bonds will be used to extend credit in the form of loans to private parties for the rehabilitation of their residential properties, in violation of the above-quoted provision of the state Constitution. City argues, however, that when the benefit to individuals is merely incidental to a primary public purpose, expenditures of public funds which would otherwise appear to contravene article XIII, section 25, have been held to be valid.

In examining the provisions of the Act, we note that the Act purports to authorize local agencies such as the City and County of San Francisco to lend money to participating parties for the purpose of residential rehabilitation (§ 37912).[3] " 'Participating party' " is defined as "any person, company, corporation, partnership, firm, local agency, political subdivision of the state, or other entity or group of entities requiring financing for residential rehabilitation pursuant to the provisions of this part." (§ 37912, subd. (e).) Local agencies are also authorized by the terms of the Act to issue bonds and bond anticipation notes of the local agency for the purpose of funding or refunding such bonds or notes (§ 37916).[4] Thus, the Act, which by its provisions purports to authorize cities and counties to extend credit in the form of loans to private parties, and chapter 32 of the San Francisco Administrative Code and the bond resolution which implement these legislative provisions, would appear to violate article XIII, section 25, of the California Constitution.

---

[3] " 'Residential rehabilitation' " is defined to mean "the construction, reconstruction, renovation, replacement, extension, repair, betterment, equipping, developing, embellishing, or otherwise improving residences consistent with standards of strength, effectiveness, fire resistance, durability, and safety, so that such structures are satisfactory and safe to occupy for residential purposes and are not conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, or crime because of any one or more of the following factors:

"(1) Defective design and character of physical construction.
"(2) Faulty interior arrangement and exterior spacing.
"(3) Inadequate provision for ventilation, lighting, and sanitation.
"(4) Obsolescence, deterioration, and dilapidation." (§ 37912, subd. (f).)

[4] Under the terms of the ordinance establishing the City's residential assistance program, each owner of property located within a residential rehabilitation area is eligible for a conventional RAP loan provided the owner demonstrates the ability to repay such loan, makes timely application and meets the other requirements of the ordinance (ch. 32, § 32.60, San Francisco Admin. Code). Under the terms of the bond resolution, each loan is to be secured by a promissory note payable to the City and by a duly executed and acknowledged mortgage on the residential real property, securing payment of the promissory note (Resolution 377-74, § 3.03).

■ The rule is well established, however, that if a public purpose is served by the expenditure of public funds, article XIII, section 25, is not violated even though there may be incidental benefits to private persons (*People* v. *City of Long Beach* (1959) 51 Cal.2d 875 [338 P.2d 177]; *City of Oakland* v. *Williams* (1929) 206 Cal. 315 [274 P. 328]; *Veterans' Welfare Board* v. *Jordan* (1922) 189 Cal. 124, 145-146 [208 P. 284, 22 A.L.R. 1515]; *County of Riverside* v. *Whitlock* (1972) 22 Cal.App.3d 863, 877 [99 Cal.Rptr. 710]; *Winkelman* v. *City of Tiburon* (1973) 32 Cal.App.3d 834, 844-846 [108 Cal.Rptr. 415]). It has also been held that the determination of what constitutes a public purpose is primarily a matter for the Legislature, and its discretion will not be disturbed by the courts so long as that determination has a reasonable basis (*County of Alameda* v. *Carleson, supra,* 5 Cal.3d at p. 746; *County of Alameda* v. *Janssen* (1940) 16 Cal.2d 276, 281 [106 P.2d 11, 130 A.L.R. 1141]).

■ The history of the legislation reveals that the Act was passed as urgency legislation in the fall of 1973 (Stats. 1973, ch. 1199, § 1, effective Oct. 2, 1973, ch. 1201, § 1, effective Oct. 2, 1973) in order to fill a gap to be created by the federal government's discontinuance of its Federally Assisted Code Enforcement (FACE) program, as the federal government moved away from grants for specific purposes into revenue sharing.[5]

The FACE program, in operation since 1967, had been successful in arresting the decline of several areas in San Francisco as well as in other California communities.[6] At the time of the first amendment to the Act, funds for the FACE program had been impounded, and the Legislature expressed its concern that current programs not be interrupted and that

---

[5]In designating the legislation as an urgency statute, the Legislature made the following findings: "Federal financial assistance for residential rehabilitation under the Federally Assisted Code Enforcement program has been terminated. The burden of financing residential rehabilitation has now fallen upon the major cities in the State of California. *It is imperative to facilitate local financing of residential rehabilitation together with private-sector cooperation, so that urban neighborhoods will not deteriorate and become subject to blight, constituting buildings which are unfit or unsafe to occupy for residential purposes and are conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, and crime.* Unless this act is passed as an urgency statute, the financing of residential rehabilitation will cease and the several major cities in the State of California having staffs experienced in the administration of the Federally Assisted Code Enforcement program will be discharged, thus preventing the continuance of the financing of residential rehabilitation in such cities on an orderly basis during the fiscal year 1973-74. For these reasons it is necessary that the act take effect immediately." (Stats. 1973, ch. 1199, § 3; ch. 1201, § 3; italics added.)

[6]City advises us that its three-part program for the rehabilitation of deteriorating residential neighborhoods, as set forth in RAP, i.e., code enforcement, public improvements and loans for rehabilitation work, is virtually identical to the FACE program which operated successfully in San Francisco in several neighborhoods: Alamo Square, Bernal Heights, Duboce Triangle, Great Highway, Arguello Park, Glen Park and Buena Vista.

new programs be initiated without delay (Stats. 1974, ch. 419, § 3, effective July 10, 1974). The Legislature also designated its second amendment to the Act as urgency legislation, noting that priority in the allocation of federal funds becoming available to residential rehabilitation would be given to communities which were independently pursuing programs of residential rehabilitation (Stats. 1974, ch. 1016, § 6, effective Sept. 23, 1974).[7]

City is committed by its master plan to "maintain and improve the quality and diversity of San Francisco's residential communities." The residence element of the plan notes that "The quality and diversity of most of San Francisco's residential communities as well as the generally sound condition of the housing units, suggest that *renewal through rehabilitation be applied without large-scale residential clearance.*" (Italics added.) That policy is restated in Resolution No. 426-73 authorizing the establishment of RAP. In that resolution City found that the cost of repairing and upgrading dilapidated structures is generally far less than demolition and replacement housing; that the rehabilitation of existing housing results in less personal hardship, involves less overall social costs, and retains neighborhood identity; and that unless the City intervenes to provide some form of assistance to finance housing rehabilitation, many depressed residential areas of San Francisco will deteriorate at an ever accelerating pace, since, with but rare exceptions, property owners cannot obtain improvement loans under any terms or conditions as it is economically imprudent for private lenders to make spot rehabilitation loans in deteriorating areas unless there is solid evidence that a representative portion of the area will be improved and upgraded.[8]

City also made findings of an urgent need for public assistance in order that many properties and neighborhoods might be rehabilitated immediately; that financing on reasonable terms must be made available to owners in designated deteriorating areas in order that they can make needed improvements; that many tenants living in buildings needing

---

[7]On August 22, 1974, the President signed the Community Development Act, which consolidated several programs administered through the United States Department of Housing and Urban Development, including FACE, Model Cities, and Redevelopment, into a comprehensive community development program beginning January 1, 1975.

[8]These findings would not appear to support respondent's contention that the loans will be a financial bonanza for absentee landlords who are perfectly capable of financing their own code compliance. City advises us that, as a practical matter, some of the neighborhoods which have been FACE areas or which will be RAP areas have been unofficially "red lined" by lending institutions, and even if funds have been available, they have been available either for shorter than usual periods or for higher than usual interest rates.

rehabilitation cannot afford substantial rent increases; that public dollars invested in rehabilitation assistance will eventually be returned to the City in part through increased property tax revenues; and that a joint private-public effort is necessary to generate sufficient resources for an effective rehabilitation program in San Francisco.

There is no longer any question that redevelopment is a public purpose which a municipality may pursue. The expenditure of public funds for the purpose of slum clearance and redevelopment has long been recognized as a public use (*Redevelopment Agency* v. *Hayes* (1954) 122 Cal.App.2d 777, 802-803 [266 P.2d 105]; see also *The Housing Authority* v. *Dockweiler* (1939) 14 Cal.2d 437, 449-450 [94 P.2d 794]; *Berman* v. *Parker* (1954) 348 U.S. 26 [99 L.Ed. 27, 75 S.Ct. 98]).

In upholding the constitutionality of the Community Redevelopment Law (§ 33000 et seq.), in *Redevelopment Agency* v. *Hayes, supra,* the court stated at pages 802-803, "as our community life becomes more complex, our cities grow and become overcrowded, and the need to use for the benefit of the public areas which are not adapted to the pressing needs of the public becomes more imperative, a broader concept of what is a public use is necessitated. Fifty years ago no court would have interpreted under the eminent domain statutes, slum clearance even for public housing as a public use, and yet, it is now so recognized. In addition, slum clearance for redevelopment purposes is likewise so recognized. To hold that clearance of blighted areas as characterized by the act and as shown in this case and the redevelopment of such areas as contemplated here are not public uses, is to view present day conditions under the myopic eyes of years now gone."

In the course of redevelopment, however, recompense must be made to the owners of property in areas constituting the slums, tax revenue is lost and residents are displaced as the area is cleared, and the new construction which arises upon the cleared land is often cold and sterile. That redevelopment has proved to be exceedingly expensive is illustrated in the preface to Residential Rehabilitation; Private Profits and Public Purposes, by Colean and Nash (1959), wherein the authors point out that "Obviously, the whole task of maintenance and renewal of our cities is not to be accomplished by the dramatic course of total clearance and total rebuilding. Clearance has its important place; but it will be wastefully costly, except where the existing situation is clearly beyond less drastic treatment or where there is the clear opportunity for a new and better paying use for the land. For the rest, dependence must be placed upon the maintenance, improvement, and adaptation of existing structures."

Rehabilitation is also less disruptive to the lives of the people who inhabit the area than is redevelopment. At page xxvi, Colean goes on to comment on the human side of rehabilitation: "Rehabilitation has another aspect—the human aspect—that is often given too little attention. Neighborhoods, even rundown neighborhoods, often have meaning to their residents. Personal associations, attachment to a church, a sense of community, all involve intangible values worth preserving where they are found or may be stimulated. Rehabilitation may preserve and strengthen these values. Clearance never can. Desirable and unavoidable as it may frequently be, large-scale clearance is always disruptive of community feeling. It contributes, at least temporarily, to the rootlessness and impersonality of urban life. A well established program of rehabilitation, on the other hand, is an influence for stability, for continuity, for identification. It is worthwhile on this score alone."

Thus, it has been recognized that the prevention of slums as well as their elimination serve a public purpose (*People* v. *City of Chicago* (1954) 3 Ill.2d 539 [121 N.E.2d 791, 798]; *Massachusetts Hous. F. Ag.* v. *New England Mer. Nat. B.* (1969) 356 Mass. 202 [249 N.E.2d 599, 606]).[9]

Section 37911 of the Act, as amended, reads as follows: "The Legislature hereby finds and declares that it is necessary and essential that cities, counties, and cities and counties, and redevelopment agencies and housing authorities within such cities, counties, and cities and counties, be authorized to make long-term, low-interest loans to finance residential rehabilitation in depressed residential areas in order to encourage the upgrading of property in such areas. Unless such local agencies intervene to provide some form of assistance to finance residential rehabilitation, many depressed residential areas will deteriorate at an accelerated pace because property owners are not able to obtain rehabilitation loans from private sources."

It is clear, therefore, that the Legislature and the City have determined that the deterioration of urban neighborhoods, with its attendant adverse

---

[9]The costs of urban blight are vividly described in Waverly, A Study in Neighborhood Conservation, published by the Federal Home Loan Bank Board (1940) at pages 1-2: "The capital loss occasioned by community disintegration is, of course, apparent to the most casual observer. Once decay sets in, property values gradually decline until, finally, they reflect only such income as 'man's inhumanity toward man' can currently extract through postponed repair, overcrowding, and illegitimate occupancy. The shrinkage in investment values does not, however, represent the entire loss incident to neighborhood disintegration. The per capita cost of necessary municipal services, such as fire and police protection, sewers, water supply, street lighting and pavement—the cost of education, health and hospital service—and the cost of delinquency, immorality, and crime, is always proportionately greater in the slums than it is in the balance of a given urban area."

social consequences: ill health, transmission of disease, infant mortality, juvenile delinquency and crime, as well as economic consequences in loss of tax revenues and increased costs for police and fire protection, cannot be arrested by presently existing means, and that local financing of residential rehabilitation is necessary and essential to avoid these evils and the more costly remedy of redevelopment which will ultimately be required if the designated areas continue to decline and decay (§ 37911; § 3 of the Act; board of supervisors resolution No. 426-73). Such a determination of a public purpose is peculiarly the function of the Legislature, not of the courts (*City of Oakland* v. *Williams, supra,* 206 Cal. at pp. 332-333; *Dittus* v. *Cranston, supra,* 53 Cal.2d at p. 286), and under the circumstances shown, we find it to be reasonable (*County of Alameda* v. *Carleson, supra,* 5 Cal.3d at p. 746; *County of Alameda* v. *Janssen, supra,* 16 Cal.2d at p. 281; *The Housing Authority* v. *Dockweiler, supra,* 14 Cal.2d at pp. 449-450; *Redevelopment Agency* v. *Hayes, supra,* at p. 802).

We hold, therefore, that since the primary purpose of the Act and the bond resolution adopted by City pursuant to the Act is to promote a compelling public interest, such legislation does not contravene article XIII, section 25, despite the fact that, incidental to the main purpose, there results an advantage to private parties.

■ *Issue: Does the bond resolution, adopted pursuant to the Act, contravene article XIII, section 40, of the California Constitution, which requires a vote of the electors before a city may incur any indebtedness or liability for any purpose exceeding in any year the income and revenue provided for such year? No.*

We now reach the issue of whether the bond resolution, enacted pursuant to the Act, contravenes article XIII, section 40, of the state Constitution.

Article XIII, section 40, of the Constitution provides in relevant part as follows: "No county, city . . . shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose . . . ."

Respondent contends that the City's failure to submit the proposed bond issue for the approval of the electorate contravenes article XIII, section 40. City maintains, however, that when the bonds are payable from a "special fund" the voting requirements are inapplicable.

■ Under the judicially constructed special fund doctrine, which is recognized in this state and in other states throughout the country, "an obligation which is payable out of a special fund is not an 'indebtedness or liability' of a governmental body within the meaning of . . . the Constitution if the governmental body is not required to pay the obligation from its general funds, or by exercise of its powers of taxation, should the special fund prove insufficient." (*City of Oxnard* v. *Dale* (1955) 45 Cal.2d 729, 737 [290 P.2d 859]; *City of Palm Springs* .v. *Ringwald* (1959) 52 Cal.2d 620, 626 [342 P.2d 898]; *City of Redondo Beach* v. *Taxpayers, Property Owners, etc., City of Redondo Beach* (1960) 54 Cal.2d 126, 131-132 [5 Cal.Rptr. 10, 352 P.2d 170].)

■ The Act provides that the bonds issued under its provisions shall not be deemed to constitute a debt or liability of the local agency but shall be payable solely from revenues, and that the issuance of the bonds shall not directly, indirectly, or contingently obligate the legislative body to levy or pledge any form of taxation or to make any appropriation for their payment (§ 37920).

Similar provisions appear in section 11.01 of the bond resolution. Moreover, section 2.03 of the bond resolution, which specifies the form of the bonds, provides that the bonds shall state on their face that neither the faith and credit nor the taxing power of the City is pledged to the payment of the bonds and that no holder shall ever have the right to compel any exercise of any taxing power of the City to pay the bond.

Respondent contends, however, that because City has reserved to itself the power to make discretionary contributions to the revenues pledged for the repayment of the bonds, it has in effect obligated its general fund.[10] Respondent contends that through this mechanism the City might be induced, if a high mortgage default rate should be encountered by the RAP, making the revenues from the loans insufficient to service the bonds, to make the bond payments through its general fund in order to preserve its high credit rating.

A similar argument was made and rejected in *City of Oxnard* v. *Dale, supra,* wherein it was held that the economic advisability of making such an expenditure is not tantamount to an " 'indebtedness or liability' " within the meaning of section 40 of article XIII (45 Cal.2d at p. 735). The

---

[10]Revenues to be pledged to the payment of the principal and interest on the bonds are to be derived from the following sources: (1) amounts received in repayment of loans made with the bond proceeds; (2) such other moneys as the board may in its discretion make available; (3) amounts realized upon the foreclosure of mortgages which the City holds to secure loans made with the bond proceeds; and (4) income earned on investment of bond proceeds (§ 1.03 of the bond resolution).

purpose of the constitutional protection of article XIII, section 40, is to "safeguard the general funds and property of a municipality from a situation whereby the holders of an issue of bonds could, at some time after the issuance thereof, force an unconsented-to increase in the taxes of, or foreclose on the general assets and property of the issuing public corporation to obtain payment of the principal or interest thereon." (*City of Redondo Beach* v. *Taxpayers, Property Owners, etc., City of Redondo Beach, supra,* 54 Cal.2d at p. 131.) In conformity with this purpose, the courts of most jurisdictions in this country have recognized that a bond issue which *by its terms* could never become a charge on the general funds or property of a municipality is not subject to the requirements of a submission to the electorate (*City of Redondo Beach,* at p. 131).

Here, the resolution authorizing the proposed bond issue and the form of the bond to be issued specify that the bondholders shall have no right to compel the exercise of any taxing power by the City. Consequently, the City's pledge of such other moneys as it may in its discretion make available may not be converted into a legally enforceable obligation; i.e., that the City is "*required* to pay the obligation from its general funds, or by exercise of its powers of taxation, should the special fund prove insufficient." (*City of Oxnard* v. *Dale, supra* at p. 737; italics added; see also *City of Palm Springs* v. *Ringwald, supra,* at p. 626.)

We hold, therefore, that the special fund doctrine has been satisfied, and that the bond issue authorized by the bond resolution, adopted pursuant to the Act, is not subject to the voting requirements of article XIII, section 40, of the state Constitution.

█ *Issue: Does the bond resolution, adopted pursuant to the Act, violate article XXXIV, section 1, of the California Constitution, which requires the approval of a majority of the electorate to establish a low-rent housing project? No.*

Article XXXIV, section 1, provides in relevant part: "No low rent housing project shall hereafter be developed, constructed, or acquired in any manner by any state public body until, a majority of the qualified electors of the city, town or county . . ., approve such project . . . .

"[T]he term 'low rent housing project' shall mean any development composed of urban or rural dwellings, apartments or other living accommodations for persons of low income, financed in whole or in part by the Federal Government or a state public body or to which the Federal Government or a state public body extends assistance by supplying all or part of the labor, by guaranteeing the payment of liens, or otherwise. . . .

". . .'[P]ersons of low income' shall mean persons . . . who lack the amount of income which is necessary (as determined by the state public body developing, constructing, or acquiring the housing project) to enable them, without financial assistance, to live in decent, safe and sanitary dwellings, without overcrowding."

Article XXXIV was held constitutional in *James* v. *Valtierra* (1971) 402 U.S. 137, 143 [28 L.Ed.2d 678, 683, 91 S.Ct. 1331], wherein the court stated that "This procedure ensures that all the people of a community will have a voice in a decision which may lead to large expenditures of local governmental funds for increased public services and to lower tax revenues."

As the Attorney General has observed, the purpose of the article was to avoid, without first securing the approval of the electorate, " 'the impact [that] a large permanent or long-term public project would have on the physical characteristics of a community . . . [and] of the financial burden purportedly resulting from a project's local tax exemptions and other forms of local assistance.' [Citations.]" (51 Ops.Cal.Atty.Gen. 245, 247 (1968).)

The Attorney General has ruled that there is a distinction between the initial bringing into being of a low-rent housing project and the *rehabilitation or reconstruction* of a *pre-existing* low rent housing project. In his ruling, the Attorney General stated: "[T]here would appear to be no 'impact . . . on the physical characteristics of a community' (at least, not in any negative sense) by replacing what had already existed in the community. Additionally, in connection with the nature of the impact upon the community, it would certainly appear reasonable to presume that the purposes of the law would not be served by requiring communities to endure the deterioration of large housing projects within their confines until authorization to rehabilitate and reconstruct such projects is secured at an election. The pernicious effect of areas of substandard housing upon the community as a whole is well known. . . . Considering that laws should be given a construction that will lead to a wise policy, rather than to mischief, and that in construing a law, the consequences that might flow from a particular interpretation may be considered [citation], a rational adherence to the rules of statutory construction would seem to preclude an interpretation of article XXXIV that would eventuate in such untoward consequences." (53 Ops.Cal. Atty.Gen. 120, 121-122 (1970).)

Under the facts shown here, it is clear that City is not developing, constructing, or acquiring new housing for low income persons. Nor is it converting existing housing into housing for low income persons. City

points out that no person living in the areas to be rehabilitated will be subject to an income test to determine eligibility to reside in property which is to be rehabilitated with the proceeds of the bonds which are the subject of this proceeding. The City is merely proposing a program to encourage owners of property in the areas to be rehabilitated to repair and improve their own properties in order to meet City housing and building code requirements, and the program of residential rehabilitation envisioned by the City should *reduce* rather than increase expenditures for public services and should *increase* rather than lower tax revenues.

Under the circumstances shown, the proposed use of the bond proceeds to make long-term low interest loans to owners of property in areas designated under the RAP for the purpose of rehabilitating their own properties does not constitute the establishment of a "low rent housing project" within the meaning of article XXXIV, section 1, of the Constitution so as to require the approval of the electorate.

Let a peremptory writ of mandate issue directing respondent to cause to be printed residential rehabilitation bonds as required by section 11.13 of the bond resolution.

Taylor, P. J., and Rouse, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied April 10, 1975.