[Civ. No. 40332. First Dist., Div. One. Nov. 29, 1977.]

REDEVELOPMENT AGENCY OF THE CITY OF SAN PABLO,
Plaintiff and Respondent, v.
LOUIS SHEPARD, Defendant and Appellant.

**COUNSEL**

Leland F. Reaves for Defendant and Appellant.

Wilson, Jones, Morton & Lynch, Kenneth I. Jones and Robert G. Auwbrey for Plaintiff and Respondent.

**OPINION**

**AVAKIAN, J.**\*—Appellant, who is Executive Director of the Redevelopment Agency of the City of San Pablo (herein Agency), has appealed from a judgment validating the proposed issuance of $10 million in revenue bonds to finance the Redevelopment Plan for the Oak Park Community Redevelopment Project initially adopted by the Agency and approved by the City Council of San Pablo in 1973, and again approved by both bodies on January 12, 1976, with amendments bringing the project under the Redevelopment Construction Loans Act (Health & Saf. Code, § 33750 et seq.), which was adopted as an urgency measure in 1975 and became effective on April 30, 1975.

### STATEMENT OF CASE

Respondent filed this action as an in rem proceeding to validate the proposed bond issue pursuant to Health and Safety Code section 33799 and Code of Civil Procedure section 860. Appellant was the only party who answered. The redevelopment plan called for conversion of what had been determined to be a blighted area into a residential development which would include low-density residential, multi-family residential, and commercial areas. The sale and lease of lands would be at fair market value, and there would be no income test either for loan eligibility or for purchase or occupancy of the newly constructed properties.

The judgment is attacked on these three grounds: (1) The project violates article XVI, section 6 of the California Constitution, which prohibits gifts of public money or property or the use of public credit in aid of private persons or organizations; (2) the act unconstitutionally delegates legislative power to the Agency; and (3) the project requires voter approval under article XXXIV, section 1 of the state Constitution.

We conclude that none of these contentions is valid.

1. THE REDEVELOPMENT PLAN DOES NOT INVOLVE A GIFT OF PUBLIC FUNDS OR AN IMPROPER USE OF PUBLIC CREDIT.

The prohibition against giving or lending the property or credit of the state to private persons or groups is contained in the following portion of article XVI, section 6 of the state Constitution: "The Legislature shall

---

*Assigned by the Chairperson of the Judicial Council.

have no power to give or to lend, or to authorize the giving or lending, of the credit of the State, or of any county, city and county, city, township or other political corporation or subdivision of the State now existing, or that may be hereafter established, in aid of or to any person, association, or corporation, whether municipal or otherwise, or to pledge the credit thereof, in any manner whatever, for the payment of the liabilities of any individual, association, municipal or other corporation whatever; nor shall it have power to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever; . . . ."

It is well established that this provision does not preclude expenditures and disbursements for public purposes. "The benefit to the state from an expenditure for a 'public purpose' is in the nature of consideration and the funds expended are therefore not a gift even though private persons are benefited therefrom." (*County of Alameda* v. *Janssen* (1940) 16 Cal.2d 276, 281 [106 P.2d 11, 130 A.L.R. 1141].)

The most recent application of this principle to housing legislation is *California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575 [131 Cal.Rptr. 361, 551 P.2d 1193]. That decision upheld the Zenovich-Moscone-Chacon Housing and Home Finance Act (Health & Saf. Code, § 41000 et seq.) against a charge that the making of loans to private investors and mortgage lenders at below-market interest rates constituted a gift of public funds.

What constitutes an adequate public purpose for expenditures which incidentally benefit private persons is primarily a matter of legislative discretion which will not be disturbed by the courts if it has a reasonable basis. (*County of Alameda* v. *Janssen, supra,* 16 Cal.2d at p. 281; *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 746 [97 Cal.Rptr. 385, 488 P.2d 953]; *California Housing Finance Agency* v. *Elliott, supra,* 17 Cal.3d at p. 583.)

The statutory enactment in this case contains a legislative declaration of a need for redevelopment agencies to generate mortgage funds and provide financial assistance to finance residential construction, lest many redevelopment areas "stagnate and deteriorate because owners and investors are not able to obtain loans from private sources." (Health & Saf. Code, § 33750.)

The Legislature made the following specific findings in Health and Safety Code section 33751: "The Legislature further finds and determines that a program to provide residential construction financing would accomplish the following: [¶] (a) Facilitate increasing the supply of urban housing and ease the housing shortgage that exists in many parts of the state. [¶] (b) Encourage Californians of all social and economic positions to reinhabit urban areas, thereby rendering these areas more socially balanced and economically self-sufficient. [¶] (c) Reduce pressures for suburbanization and thereby mitigate many of the problems caused by urban migration, including inefficient use of scarce energy resources and urban sprawl. [¶] (d) Stimulate urban building and construction activity and thereby increase urban employment and improve the urban tax base."

It made this further declaration of policy in Health and Safety Code section 33752: "It is the intent of the Legislature, in enacting this chapter, to strengthen the vitality and promote the completion of urban redevelopment for the general public benefit. The construction of federally assisted housing for low- and moderate-income households is not a primary purpose of this chapter. However, nothing in this chapter shall be deemed to prohibit financing of federally assisted housing for low- and moderate-income households when such housing is consistent with the redevelopment plan and the loan is directly or indirectly insured."

The omission of any guaranteed benefit for low and moderate income persons is the prime basis for appellant's contention that there is no adequate public purpose in this project.

It now appears settled, however, that providing decent housing for the public in a general way is a public purpose even though no precise segment of the public is defined as a backdrop for evaluating the public interest to be served. (*The Housing Authority* v. *Dockweiler* (1939) 14 Cal.2d 437 [94 P.2d 794]; *Redevelopment Agency* v. *Hayes* (1954) 122 Cal.App.2d 777 [266 P.2d 105]; *Winkelman* v. *City of Tiburon* (1973) 32 Cal.App.3d 834 [108 Cal.Rptr. 415]; *Board of Supervisors* v. *Dolan* (1975) 45 Cal.App.3d 237 [119 Cal.Rptr. 347].)

The *Elliott* opinion sees in these cases common threads of substantial public purpose in upgrading residential housing even though no identical combination of elements was involved and even though there was a range from serving only low-income families (*Dockweiler*) to completely ignoring income as a test (*Dolan*).

The findings recited in Health and Safety Code sections 33750 and 33751, *supra,* show a substantial public purpose for the act and for its authorization of projects like the instant one.

## 2. There Is No Unconstitutional Delegation Of Legislative Power To The Agency.

Appellant contends that the act delegates legislative authority to the Agency without adequate guidelines in the following respects: (1) The authority to establish fees, charges and interest rates (Health & Saf. Code, § 33762); (2) the power to establish rules and regulations (Health & Saf. Code, § 33767); (3) the authority to establish architectural and engineering design standards (Health & Saf. Code, § 33790); and (4) the power to do all things necessary or convenient to carry out the purposes of this chapter.

These contentions are not persuasive. The powers delegated are those which must customarily be exercised by an administrative agency in a manner tailored to the exigencies of its activities and in the light of the practical considerations of the market place. They are substantially identical with the provisions of the housing statutes involved in *Elliott* and *Dolan, supra* (which did not discuss their validity because no challenge on that ground was made). Should the occasion arise, the validity of any particular exercise of such powers can be determined in the light of the purpose and intent of the legislation considered in the context of the market-place conditions to which the Agency's action relates.

## 3. The Project Does Not Require Voter Approval Under Article XXXIV, Section 1 Of The State Constitution.

The pertinent portion of article XXXIV, section 1 of the state Constitution reads as follows:

"No low rent housing project shall hereafter be developed, construct-ed, or acquired in any manner by any state public body until, a majority of the qualified electors of the city, town or county, as the case may be, in which it is proposed to develop, construct, or acquire the same, voting upon such issue, approve such project by voting in favor thereof at an election to be held for that purpose, or at any general or special election.

"For the purposes of this article the term *'low rent housing project'* *shall mean any development* composed of urban or rural dwellings, apartments or other living accommodations *for persons of low income,* financed in whole or in part by the Federal Government or a state public body or to which the Federal Government or a state public body extends assistance by supplying all or part of the labor, by guaranteeing the payment of liens, or otherwise. For the purposes of this article only there shall be excluded from the term 'low rent housing project' any such project where there shall be in existence on the effective date hereof, a contract for financial assistance between any state public body and the Federal Government in respect to such project.

"For the purposes of this article only *'persons of low income'* shall mean *persons or families who lack the amount of income which is necessary (as determined by the state public body developing, constructing, or acquiring the housing project) to enable them, without financial assistance, to live in decent, safe and sanitary dwellings, without overcrowding."* (Italics added.)

Until the decision in *California Housing Finance Agency* v. *Elliott, supra,* 17 Cal.3d 575, it was not clear that the public referendum requirement extended to housing projects which were built and owned by private persons under financing arrangements with a public body, as distinguished from projects in which the public body itself directly developed, constructed, or acquired the housing project.

*Elliott* involved the Zenovich-Moscone-Chacon Housing and Home Finance Act (Health & Saf. Code, § 41000 et seq.), which authorized the California Housing Finance Agency to issue revenue bonds to generate funds to lend to private developers and local public entities, to enable them to finance new construction and rehabilitation in order to meet the housing needs of persons and families of low or moderate income. The court rejected the contention that the fact of private development and ownership placed the projects outside the scope of the referendum requirement. It described the extensive participation of the Agency 'in determining the nature and extent of the projects and in supervising and regulating the manner in which they were operated and concluded that such activity rendered the Agency a "developer" within the meaning of article XXXIV, section 1.

The reason for the referendum has on occasion been described as the impact on the taxpayers of shifting property from the tax rolls to

tax-exempt status by reason of public agency ownership. (See *James* v. *Valtierra* (1971) 402 U.S. 137 [28 L.Ed.2d 678, 91 S.Ct. 1331].) *Elliott* makes it clear that the reason is broader than concern for the tax base. "While it is not clear whether or not the projects before us will have the benefit of a local tax exemption (see Rev. & Tax. Code, § 214), they will certainly have an impact, the dimensions of which may not as yet have been measured, on the physical characteristics of a community. It is also reasonable to conclude that the projects will place some financial strain on the taxpayers whose communities must provide additional services and assistance to low-income tenants. The electors in the affected communities must not be deprived of the opportunity to approve or disapprove the projects solely because private parties act as conduits for the purposes of carrying out the state-sponsored and Agency-regulated housing program. We therefore conclude that the Agency must be deemed to develop, construct, or acquire projects within the meaning of article XXXIV, section 1." (*California Housing Finance Agency* v. *Elliott, supra,* 17 Cal.3d at pp. 591-592.)

In this case, too, the Agency does much more than merely lend money. It initially shapes and defines the project, geographically, functionally, and aesthetically. It determines the terms, conditions, and cost of the lending arrangements. It may buy, sell, or lease property; hire engineers, architects, accountants, and other experts; and make and enforce rules against discrimination in the construction, sale, or lease of the project properties.

It is clear, therefore, that this project is one that is "developed, constructed, or acquired in any manner" by a state public agency within the meaning of article XXXIV, section 1, as construed in *Elliott.*

There remains the question of whether this is a "low rent housing project" within the meaning of article XXXIV, section 1, which defines that term as "any development composed of . . . living accommodations for persons of low income." It also defines "persons of low income" as those "who lack the amount of income which is necessary (as determined by the . . . public body developing . . . the housing project) to enable them, without financial assistance, to live in decent, safe and sanitary dwellings, without overcrowding."

The Agency argues that the occupants of the residential units will not be selected on the basis of income, that private developers will have sole

and complete control over who lives in the units (whether by purchase or lease), and that the units are not being constructed for low income people even if in fact some should eventually become residents.

The trial court made no factual finding on the specific question of the extent to which the occupants would or might be "persons of low income." In fact, that cannot be determined in advance, because it will depend on future decisions as to size, character, and cost of the units to be developed, and market conditions at that time. If the reduced interest rate subsidy is passed on to the eventual occupants in the form of lower sales price or rent than would otherwise prevail, the housing will become available to persons who otherwise might not have been able to afford it. To what extent this would result in occupancy by persons of low income (as distinguished from moderate or high income) is wholly a matter of speculation. The act gives the Agency no authority to fix rental rates charged to tenants or limit the profits of the private developers and owners.

Conceivably, some occupants would be recipients of public assistance and would fit the definition of "persons of low income." We conclude that this speculative possibility does not make the referendum provision applicable. The opinion in *Elliott, supra,* taking note of the dictum in *Winkelman* v. *City of Tiburon, supra,* 32 Cal.App.3d at page 838, that the referendum provision did not apply to projects in which only 30 percent of the units were for persons of low income, expressly reserved for future determination whether "a housing project which consists of a relatively small portion of low-income tenants" comes within the referendum requirement. (17 Cal.3d at p. 593.) We believe that language relates to a project in which some express provision is made for low-income housing.

Although the article XXXIV, section 1 definition of "persons of low income" is phrased in general language, it does include as one element a determination by the public agency of inability to live in decent housing without financial assistance. This project contains no such determination, nor does it provide for reserving any housing for people who need such financial assistance. In keeping with the announced purposes of the act, it seems designed to reverse the flight to the suburbs and encourage reinhabitation of urban areas, without regard to the income level or economic needs of the potential inhabitants.

We conclude that a referendum is not required. Accordingly, the judgment is affirmed.

Racanelli, P. J., and Sims, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 26, 1978.