[No. A015150. First Dist., Div. Five. May 1, 1985.]

CITY AND COUNTY OF SAN FRANCISCO,
Plaintiff and Respondent, v.
THE MUNICIPAL COURT FOR THE SAN FRANCISCO JUDICIAL
DISTRICT OF THE CITY AND COUNTY OF SAN FRANCISCO,
Defendant and Respondent;
HARRY STRAUCH et al., Real Parties in Interest and Appellants.

714

COUNSEL

Terence Hallinan and Michael Mendelson for Real Parties in Interest and Appellants.

George Agnost, City Attorney, David Edward May, Grazilla Walsh and Burk E. Delventhal, Deputy City Attorneys, for Plaintiff and Respondent.

Elwyn L. Johnson, City Attorney (Modesto), and Roger Picquet, Assistant City Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

No appearance for Defendant and Respondent.

OPINION

**HANING, J.**—Harry Strauch and Howard Gottstein, appellants and real parties in interest, appeal the issuance of a peremptory writ of mandate compelling the San Francisco Municipal Court to vacate its order quashing inspection warrants issued for two properties in the Upper Ashbury area of San Francisco and compelling it to reissue same. The warrants were originally issued when appellants refused an inspection of their premises pursuant to a San Francisco Rehabilitation Assistance Program (RAP) rehabilitation of the area. ▮ Appellants contend the affidavits offered in support of the warrants are constitutionally insufficient because they do not provide probable cause to inspect. We affirm.

The Marks-Foran Residential Rehabilitation Act of 1973 (Health & Saf. Code, § 37910 et seq.) authorizes cities, counties, and their redevelopment agencies and housing authorities "to make long-term, low-interest loans to finance residential rehabilitation in depressed residential areas in order to encourage the upgrading of property in such areas ([Health & Saf. Code,]

§ 37911) and to issue bonds for the purpose of financing such residential rehabilitation ([Health & Saf. Code,] § 37916)." (*Board of Supervisors* v. *Dolan* (1975) 45 Cal.App.3d 237, 240 [119 Cal.Rptr. 347].) Before issuing bonds, the local agency is required to adopt a comprehensive residential rehabilitation financing program, which must include, among other things, "(a) Criteria for selection of residential rehabilitation areas by the local agency which shall include findings by the local agency that: [Par.] (1) There are a substantial number of deteriorating structures in the area which do not conform to community standards for decent, safe, sanitary housing. [Par.] (2) Financial assistance from the local agency for residential rehabilitation is necessary to arrest the deterioration of the area. [Par.] (3) Financing of residential rehabilitation in the area is economically feasible. . . . [Par.] (c) A commitment that . . . rehabilitation standards will be enforced in 95 percent of the residences in each residential rehabilitation area." (Health & Saf. Code, § 37922, subds. (a), (c).)

Pursuant to the authority granted it by the Marks-Foran Act, the San Francisco Board of Supervisors (Board) enacted an ordinance entitled "Rehabilitation Assistance Program." (Ch. 32, San Francisco Admin. Code.) The Board's resolution authorizing the RAP ordinance declared its general purpose to be "to provide adequate financial and nonfinancial assistance for rehabilitation and code compliance on a continuing basis, neighborhood by neighborhood throughout San Francisco." (Res. No. 426-473.) For RAP purposes "concentrated housing 'Code-Enforcement activities' would take place on an area-wide basis in residential neighborhoods." (*Ibid.*) Sections 32.41 through 32.43 of the San Francisco Administrative Code outline the manner in which an area shall be deemed suitable for RAP. Basically, the planning director, after public meetings in the proposed area, makes a recommendation to the chief administrative officer that the area be so designated. If the officer is satisfied such designation is appropriate, he makes the recommendation to the Board. Following a public hearing and a finding that the three Marks-Foran criteria are met, the Board, by resolution, designates the area.

After enactment of RAP, city adopted a resolution authorizing the issuance of $8 million in Residential Rehabilitation Revenue Bonds, the proceeds of which were to be used to make long-term, low-interest loans to finance residential rehabilitation in depressed residential areas. The constitutionality of both the Marks-Foran Act and the bond resolution were upheld by another division of this court in *Board of Supervisors* v. *Dolan, supra,* 45 Cal.App.3d 237, 241.

Pursuant to section 32.21 of the San Francisco Administrative Code, city's chief administrative officer promulgates rules for the administration

of RAP. Rule 2.1 provides that: "Before the Director of Planning recommends an area for designation as a residential rehabilitation area under RAP, the Department of City Planning will undertake a preliminary feasibility study to determine if designation would be desirable for the neighborhood and necessary to improve housing conditions in the area. Areas will be chosen for preliminary studies on the basis of citizen interest or apparent need." Rule 6.1.1 provides: "[A]n inspection is required of all properties within a designated RAP area for the purpose of determining whether or not properties are in conformance with the San Francisco Housing Code." San Francisco Housing Code section 301A requires the bureau of building inspection to inspect every building and structure in an area designated for area-wide concentrated code enforcement.

Board of supervisors resolution 424-74 designated the Upper Ashbury, a residential rehabilitation area under RAP after finding "(a) there are a substantial number of deteriorating structures in the Upper Ashbury which do not conform to rehabilitation standards, (b) low-cost, long-term property owner loans are necessary to arrest the deterioration of the Upper Ashbury; and (c) based additionally on currently available data and past experience with residential rehabilitation assistance projects . . . financing of residential rehabilitation in the Upper Ashbury is economically feasible." The finding was based on evidence and testimony presented at a public hearing and the recommendation of the planning director.

When appellants refused RAP inspectors inspection of their premises, city filed applications for inspection warrants. In vacating the municipal court's order quashing the inspection warrants the superior court found (1) legislative and administrative standards for selection of RAP areas were satisfied in the designation of the Upper Ashbury as there existed a substantial number of deteriorating structures in the area not conforming to community standards for decent, safe, and sanitary housing; (2) the purpose of RAP is to arrest perceived deterioration in the selected areas; (3) RAP's objectives are achieved by concentrated code enforcement, public improvements, and financial rehabilitation assistance via long-term, low-interest loans; mandatory inspections are necessary to achieve these objectives because they are essential to both code enforcement and financing; (4) the legislative and administrative standards set forth in Health and Safety Code section 37922, San Francisco Administrative Code sections 32.41 through 32.43, and RAP rule 2.1 are reasonable; (5) the designation of Upper Ashbury for RAP and area-wide inspection was reasonable; (6) reasonable legislative and administrative standards for conducting an area inspection are satisfied with respect to Upper Ashbury, citing *Camara* v. *Municipal Court* (1967) 387 U.S. 523, 528 [18 L.Ed 930, 935, 87 S.Ct. 1727] and Code of Civil Procedure

section 1822.52;[1] (7) the United States and California constitutional and statutory requirements for issuance of inspection warrants have been met; and (8) the court's findings are supported by specific factual statements in the affidavits filed with the applications for inspection warrants, and no evidence to the contrary was admitted by the municipal court.

The affidavit of Bernard A. Cummings, Division Chief of the San Francisco Department of Public Works (DPW), was filed in support of the inspection warrants. In substance it states Cummings had been involved on an ongoing basis with the proposal, development and implementation of RAP. Section 32.2(9) of the San Francisco Administrative Code defined rehabilitation standards as the standards established in the San Francisco Housing Code and other applicable San Francisco municipal codes relating to the physical condition of structures. Based on a variety of sources, the city planning department estimated that 91 percent of the residential buildings in the Upper Ashbury contained code violations in 1970, and that by April 1974, two months prior to its RAP designation, some improvement had been made but that the city planning director found that based upon available data there are a substantial number of deteriorating structures in the area that do not conform to rehabilitation standards. Both the Marks-Foran Act and the RAP ordinance require concentrated code enforcement activities to be conducted in RAP areas to insure physical compliance with all municipal codes relating to the physical condition and safety of structures. Pursuant to this legislation a routine areawide inspection program is being administered in the Upper Ashbury. Buildings which have had an approved inspection within the previous year and buildings which have been newly constructed within the previous year are excluded from inspection unless there has been a specific complaint. All other buildings are routinely inspected. DPW follows this policy because in its experience code deficiencies tend to develop in occupied buildings within approximately one year. The official records of DPW list 1,457 structures in the Upper Ashbury subject to inspection. As of April 1980, 992 had been inspected. Of those, 976 contained violations of housing, building, electrical and/or plumbing codes. In Cummings' opinion, said conditions "left unabated pose a threat to the health, safety and welfare of the occupants and the public." Affidavits submitted by Vladimir Ershov and John Powers, building inspectors with DPW, stated both appellants refused to allow inspection of their premises.

*Camara* v. *Municipal Court, supra,* 387 U.S. 523, sets the standards for administrative inspection warrants. In *Camara,* an inspector with the San Francisco Department of Public Health had entered an apartment building

---

[1]Page 719, *infra.*

to make a routine annual inspection for possible violations of the city's housing Code. The apartment manager informed the inspector that Camara, lessee of the ground floor, was using the rear of his leasehold as a personal residence. On the grounds the building's occupancy permit did not allow such residential use, the inspector confronted Camara and demanded he be allowed to inspect the premises. Camara refused in the absence of a search warrant. The court held that such searches without a warrant violate the Fourth Amendment. ■ It went on to state that " 'probable cause' [to search] is the standard by which a particular decision to search is tested against the constitutional mandate of reasonableness. To apply this standard, it is obviously necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen." (*Id.,* at pp. 534-535 [18 L.Ed.2d at p. 939].) In *Camara,* the "primary governmental interest at stake is to prevent even the unintentional development of conditions which are hazardous to public health and safety. . . . ■ In determining whether a particular inspection is reasonable—and thus in determining whether there is probable cause to issue a warrant for that inspection—the need for the inspection must be weighed in terms of these reasonable goals of code enforcement." (*Id.,* at p. 535 [18 L.Ed.2d at p. 939].) ■ Acknowledging "there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails," the court concluded area code-enforcement inspections are reasonable. (*Id.,* at pp. 536-537 [18 L.Ed.2d at p. 940].) ■ Therefore, "it is obvious that 'probable cause' to issue a warrant to inspect must exist if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling. Such standards, which will vary with the municipal program being enforced, may be based upon the passage of time . . . or the condition of the entire area, but they will not necessarily depend upon specific knowledge of the condition of the particular dwelling. . . . The warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant." (*Id.,* at pp. 538-539 [18 L.Ed.2d at p. 941].)

Coexistent with the rule established in *Camara* is Code of Civil Procedure section 1822.50 et seq., governing inspection warrants. Under section 1822.51, an inspection warrant "shall be issued only upon cause, supported by affidavit, particularly describing . . . the purpose for which the search is made." Under section 1822.52: "Cause shall be deemed to exist if either reasonable legislative or administrative standards for conducting a routine

or area inspection are satisfied with respect to the particular . . . premises
. . . ."

■■■ We first determine what valid public interest is at stake for city. *Board of Supervisors* v. *Dolan, supra,* 45 Cal.App.3d at pages 246-247 has already determined that city has a compelling public interest in preventing "the deterioration of urban neighborhoods, with its attendant adverse social consequences," and that the primary purpose of RAP is to promote this interest and is "necessary and essential to avoid these evils [the adverse social consequences]." *Dolan* also reiterated the well-established rule that "what constitutes a public purpose is primarily a matter for the Legislature, and its discretion will not be disturbed by the courts so long as that determination has a reasonable basis [citations omitted]." (*Id.,* at pp. 243, 247.)

We next determine whether reasonable legislative or administrative standards exist for conducting an area inspection.

Under Health and Safety Code section 37922, subdivision (c), the local agency, before issuing bonds, must prepare a comprehensive residential rehabilitation financing program. The program must include certain items, among them a commitment by the agency that rehabilitation standards will be enforced in 95 percent of the residences in the target area. San Francisco Administrative Code section 32.11 reiterates this requirement. Administrative Code section 32.2(9) defines the rehabilitation standards as the standards established in the San Francisco Housing Code and other applicable San Francisco Municipal Codes relating to the physical condition of a structure. Thus, to enforce the rehabilitation standards, city must enforce the housing and other building codes. Enforcement, obviously, cannot be accomplished without inspection, and *Camara* permits an inspection with a warrant to enforce building codes. Furthermore, San Francisco Administrative Code section 32.1 states the major goal of RAP is to improve the condition of deteriorating housing in given areas of San Francisco; the methods by which the goal is to be achieved are (1) financial assistance, and (2) concentrated code enforcement. Finally, a RAP loan is secured by a promissory note payable to city and a mortgage on the property to secure the note. (*Board of Supervisors* v. *Dolan, supra,* 45 Cal.App.3d at p. 242, fn. 4.) The bonds generated for the loans are thus ultimately secured by the property. To make the bonds attractive to potential buyers, there must be an agreement by city it will enforce RAP regulations, including the requirement to enforce rehabilitation standards in 95 percent of the area properties. We conclude the legislative and administrative standards for conducting an area-wide code enforcement are reasonable.

█ The affidavits in support of the inspection warrants specified both the state and city code sections authorizing RAP and described the standards for inspection set forth therein. They also incorporated by reference the resolution establishing RAP and the city planner's lengthy recommendation that Upper Ashbury be designated a RAP area. They thus provided the necessary probable cause for the warrants to issue, pursuant to Code of Civil Procedure sections 1822.51 and 1822.52.

█ Under *Camara,* a governmental agency already has permission to enter a building to check for code violations in order to prevent "even the unintentional development of conditions which are hazardous to public health and safety" (*Camara* v. *Municipal Court, supra,* 387 U.S. at p. 535 [18 L.Ed.2d at p. 939]); it may do so based on the condition of an entire area and need not necessarily depend upon specific knowledge of the condition of the particular dwelling. (*Id.,* at p. 538 [18 L.Ed.2d at p. 941].) City could therefore inspect appellants' buildings even in the absence of RAP. RAP simply provides an additional governmental interest permitting an intrusion: the achievement of city's goal to thwart urban deterioration and its attendant problems.

Judgment affirmed.

Low, P. J., and King, J., concurred.