[No. A031219. First Dist., Div. Two. June 25, 1987.]

THOMAS ANDERSON et al., Plaintiffs and Respondents, v.
SAN FRANCISCO RENT STABILIZATION AND ARBITRATION
BOARD, Defendant and Appellant;
RICHARD KLEIN et al., Real Parties in Interest and Appellants.

COUNSEL

George Agnost and Louise H. Renne, City Attorneys, and Kathryn A. Pennypacker, Deputy City Attorneys, for Defendant and Appellant.

Richard M. Pearl, Mark K. Gillespie and Pearl Mc Neill & Gillespie for Plaintiffs and Respondents.

Peter J. Zouras and Raymond H. Levy for Real Parties in Interest and Appellants.

OPINION

SMITH, J.—San Francisco's residential rehabilitation loan program, more commonly known as the rehabilitation assistance program or RAP (San Francisco Admin. Code, § 32.1 et seq.), provides property owners in designated areas of the city with low-interest loans to rehabilitate residential property. Since its inception in 1974, the program has been administered so as to allow borrowers to pass through to tenants, under a prescribed rent formula (id., § 32.73), increased "monthly loan payments" secured by the property at the time the loan is made, including payments unrelated to rehabilitation of the property. We uphold that interpretation and, accordingly, overturn a judgment of the superior court directing that only rehabilitation-related payments be included.

Appellants are the City and County of San Francisco (city), on behalf of the San Francisco Rent Stabilization and Arbitration Board (rent board), and real parties in interest, three co-owners of rental property who borrowed under the RAP program. Respondents are six of their tenants.

BACKGROUND

RAP is administered by the city's chief administrative officer (CAO), who is assisted in all rehabilitation financing aspects of the program by the city's real estate department. (San Francisco Admin. Code, § 32.20; all undesignated section references hereafter are to that code.)

The program functions as follows. A neighborhood is first designated a "residential rehabilitation area" and targeted for building code standards enforcement and public improvements. (§§ 32.11-32.12, 32.41-32.44.) A citizens advisory committee (CAC) and an area rent committee (ARC) are formed for each area. (§§ 32.30, 32.34.)

City bond issues authorized under the enabling act, the Marks-Foran Residential Rehabilitation Act of 1973 (Marks-Foran Act or Act) (Health & Saf. Code, § 37910 et seq.), fund low-interest loans to property owners (§ 32.10) as an alternative to conventional funding sources which, in many deteriorating areas, might be unavailable as a practical matter. (*Board of Supervisors* v. *Dolan* (1975) 45 Cal.App.3d 237, 244 & fn. 8 [119 Cal.Rptr. 347].) The term of the loan can be as long as 20 years. (§ 32.61.) Owners who do not participate in RAP still have to bring their properties up to code.

RAP borrowers must meet eligibility requirements and satisfy the CAO of their ability to repay the loan. (§ 32.30, subd. (a).) In limited circumstances, a borrower can refinance preexisting debt on the property as part of a RAP loan. (§ 32.53.) The borrower signs a promissory note (§ 32.60) and gives a deed of trust on the property as security, with the city as named beneficiary. (§ 32.63.) The unpaid balance of a loan becomes due and payable on sale or transfer of ownership except where, for hardship reasons, the CAO allows assignment to a qualified new owner. (§ 32.66.)

Tenants displaced during rehabilitation of their units may qualify for relocation assistance from the city (§ 32.69, subd. (2)(b)), and the borrower agrees as a condition of the loan to give displaced tenants the right of first refusal to reoccupy the units afterward (§ 32.69, subd. (2)(a); see § 32.60, subd. (a)).

Another loan condition is that rents following rehabilitation are limited for the life of the loan. For residential rehabilitation areas designated on or after July 1, 1977, rents are governed by the city's Residential Rent Stabilization and Arbitration Ordinance (rent control ordinance) (§ 37.1 et seq.) passed in July 1979. (§ 32.73-1.) For areas designated before July 1977, rents are limited by this three-part formula: "The property owner shall agree that during the time any conventional RAP loan is outstanding, rent for any dwelling unit in the rehabilitated residence shall not exceed [1] the base rent plus [2] actual increased costs to the owner in the form of monthly loan payments, property taxes, insurance, maintenance, and [3] annual adjustments tied to the Bay Area Cost of Living Index." (§ 32.73, subd. (a), numbering added.)

Tenants who feel that a rent increase exceeds allowable limits can seek reduction and a rebate of amounts overpaid. The program originally provided for a petition to the CAO and an appeal, by either side, to the ARC. A July 1982 amendment transferred jurisdiction over such disputes to the rent board, created under the rent control ordinance, but disputes arising in RAP areas designated before July 1977 continue to be controlled by the section-32.73 formula quoted above. (§§ 32.74, 37.8, subds. (a) and (e)(5).) The sanction for an owner who refuses to rebate excess rents or otherwise comply with a rent board decision is termination of the RAP loan. (§ 32.75.)

Appellants Richard and Eva Klein bought a one-half interest in a 12-unit building in the Upper Ashbury in December 1980. They paid $175,000, putting $50,000 down and financing the remaining $125,000 with a purchase money mortgage. Their monthly payments were $1,509.25. Appellant Lena Field held the other one-half interest in the property, apparently free of mortgage payments.

The Upper Ashbury had been designated a RAP area in June 1974. Appellant owners performed RAP-mandated plumbing work without a RAP loan in the first year and then, in May 1982, received a RAP loan of $7,100 to do electrical and painting work. Their monthly RAP loan payment was $63.33. The rent formula of section 32.73 applied because the area had been designated before July 1977. When applying for the loan, appellant Richard Klein spoke with a Mr. Soo Hoo, a loan officer for the real estate department. Soo Hoo described the program in depth and explained that the costs of the purchase money mortgage could be passed along to tenants as "monthly loan payments."

Under section 32.73's formula, the initial "base rent" for a dwelling unit is ordinarily its rent as of a "base rent date" at least six months preceding the area's designation under RAP. (§ 32.73, subds. (c) and (d).) For appellant owners' units, that date was in 1973, and the rents charged at that time varied from $145 to $165, depending on the particular unit. "[A]ctual increased costs" added to "base rent" under the formula are the amounts by which "monthly loan payments, property taxes, insurance [and] maintenance" existing at the time of the RAP loan exceed any such costs that existed on the "base rent date." There were no monthly loan payments on appellants' property in 1973; thus, all allowable monthly payments for them were "actual increased costs" that they could pass on to their tenants. Finally, section 32.73's cost-of-living adjustment is applied and added to the "base rent" figure. The adjustment ultimately allowed in this case, calculated as of 1982, was 82.7 percent.

Respondent tenants objected to a notice of increased rents they received in 1982. Following initial efforts misdirected through the then-recently abolished ARC appeal procedure, they took the matter to the rent board, challenging several aspects of the increase.

The instant appeal involves only the board's actions regarding whether the Kleins' monthly mortgage payments could be passed through as increased costs under section 32.73. The matter was first heard before a hearing officer, who disallowed the payments. On appeal to the full board (§ 37.8, subd. (f)), the payments were allowed. Respondent tenants then petitioned the superior court for writ of mandate. (Code Civ. Proc., § 1094.5.) The court concluded that the rent board abused its discretion and acted contrary to law (*id.*, § 1094.5, subd. (b)) "by calculating the rent increase allowable ... under the Rehabilitation Assistance Program to include increased monthly loan payments unrelated to rehabilitation of the property." This timely appeal follows entry of the court's judgment granting a peremptory writ directing the rent board to vacate its decision.

Appellants urge (1) that the court erred by not allowing the mortgage payment pass-through and (2) that the court's interpretation would unconstitutionally deny RAP loan holders a fair rate of return on their investments (see Health & Saf. Code, § 37922.5, subd. (a)). We agree with their first argument and so do not reach the second.

## APPEAL

This case came about because whoever drafted the printed promissory note signed by RAP borrowers added three qualifying words to the provision about monthly loan payments. The ordinance states that the owner can pass on, as rent, "actual increased costs ... in the form of *monthly loan payments,* ..." (§ 32.73, subd. (a), italics added.) The phrase "monthly loan payments" is not qualified, and it is not defined anywhere else in the ordinance. The same, unqualified language is mirrored in the rules promulgated to implement the program. (Rule 7.19, par. 3(A), RAP rules; hereafter cited only by rule.)[1] It is found, again without qualification, in the deed of trust that RAP borrowers must sign.[2]

---

[1] The rules vest responsibility for calculating allowable increased costs, including monthly loan payments, with the real estate department's director of property, the department head. (Rules 1.2, 7.0, def. 5, 7.19, par. 3(B).) Paragraph 3(A) of rule 7.19 directs: "The owner shall agree that during the time his/her conventional RAP loan is outstanding, rent for any dwelling unit in the rehabilitated residence shall not exceed the base rent plus actual increased costs to the owner in the form of *monthly loan payments,* ..." (Italics added.)

[2] Paragraph 32 of the deed of trust signed by appellant owners begins: "Rent Increase Limitations. (a) Trustor agrees that during the time the obligation being secured by this Deed of

The promissory note, however, reads as follows: "I agree that so long as this loan, or any portion thereof, is unpaid, rent for any dwelling unit ... shall not exceed the base rent plus actual increased costs in the form of *loan payments to finance rehabilitation*, ...." (Italics added.)

There is no accounting for the note's language. According to testimony taken before the rent board, someone in the city attorney's office drafted the note, but the words "to finance rehabilitation" were apparently overlooked at the time and then went unnoticed by anyone in the city attorney's office or the real estate department until late 1982, after appellant owners herein had signed their note. As soon as the discrepant language was noticed, the real estate department began crossing the words out on all new loans. Borrowers had never been told that monthly loan payments had to be related to rehabilitation, as far as the record shows.

The only administrative support for the promissory note language comes from two consolidated cases that made their way to the superior court on a petition for writ of mandate. In *Dodson* v. *Upper Ashbury Area Rent Committee* (Super. Ct. City & County of S.F., No. 802210) and *West* v. *Upper Ashbury Area Rent Committee* (Super. Ct. City & County of S.F., No. 805 717) (the *Dodson* cases), the court upheld an ARC decision to disallow a pass-through of monthly mortgage payments unrelated to rehabilitation. The cases evidently involved property owners who refinanced their property to the hilt just before taking out a RAP loan, planning to take advantage of the pass-through and perhaps to avoid the rent control ordinance, which exempts RAP-loan property in RAP areas designated before July 1977. (§ 37.8, subd. (e)(5); see § 32.73, subd. (e).) The *Dodson* cases were never appealed to this court and thus have no precedential value. Nevertheless, they directly influenced the hearing officer's decision in this case and probably were what called the city attorney's office and real estate department's attention to the promissory note language. We note them for that limited, explanatory purpose.

The promissory note language is at odds with the RAP ordinance and rules, the deed of trust, and a decade of administrative interpretation relied on by RAP borrowers.

■ The central question for us is whether the superior court correctly interpreted the term "monthly loan payments" (§ 32.73, subd. (a); rule 7.19, par. 3(A)) as restricting pass-throughs to rehabilitation-related

---

Trust, or any *portion thereof*, is unpaid, rent for any dwelling unit in the rehabilitated residence shall not exceed the base rent plus actual increased costs to the Trustor in the form of *monthly loan payments*, ...." (Italics added.)

loans. ■ We construe ordinances by the same rules we apply to statutes. (*County of Madera* v. *Superior Court* (1974) 39 Cal.App.3d 665, 668 [114 Cal.Rptr. 283].) ■ The interpretation of a statute is ultimately the responsibility of the courts. Nevertheless, "the contemporaneous construction of a statute by an administrative agency charged with its administration and interpretation, while not necessarily controlling, is entitled to great weight and should be respected by the courts unless it is clearly erroneous or unauthorized [citations]. This is true particularly where there has been continued public reliance upon and acquiescence in such interpretations. [Citations.]" (*City of Santa Ana* v. *City of Garden Grove* (1979) 100 Cal.App.3d 521, 530 [160 Cal.Rptr. 907], fn. omitted; *Engs Motor Truck Co.* v. *State Bd. of Equalization* (1987) 189 Cal.App.3d 1458, 1471 [235 Cal.Rptr. 117].)

■ The administrative interpretation in this case merits great weight. Responsibility for all rehabilitation financing aspects of the program was delegated to the real estate department through the CAO. (§ 32.20; rules 1.2, 7.0, 7.6, and 7.19, par. 3.) The department always allowed pass-throughs of preexisting debt service, not just rehabilitation-related loan payments, and department loan officers began crossing out the contrary promissory note language as soon as it was discovered. Borrowers obviously must have relied on being able to pass through their mortgage debt, the greatest single cost to most property owners. The city's board of supervisors was presumptively aware of the department's long-standing interpretation when it passed many amendments over the years, none of which qualified the language "monthly loan payments." That implies acquiescence in the department's practice. (*Coca-Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918, 922 [156 P.2d 1]; *Horn* v. *Swoap* (1974) 41 Cal.App.3d 375, 382 [116 Cal.Rptr. 113]; *Engs Motor Truck Co.* v. *State Bd. of Equalization*, *supra*, 189 Cal.App.3d 1458, 1471.) We do not think that the board of supervisors' failure to clarify the ordinance following the *Dodson* cases implies any acquiescence in the *Dodson* holding. The cases had no precedential value. Besides, the record shows that the real estate department, *after discussions with the city attorney's office*, began crossing out the promissory note language. That was *after* the *Dodson* decisions, which refutes any idea of acquiescence in *Dodson* as opposed to the department's view.[3]

---

[3] Respondent tenants would have us defer, not to the department's interpretation, but to the promissory note language because, they say, "it is the *promissory note* that represents a long-standing interpretation by the City Attorney's office, whereas the Real Estate Department, which never read the note, based its 'interpretation' only on informal conversations among its staff." Respondents lose perspective. It is the interpretation of *the ordinance*, not the promissory note, that concerns us. Also, even if there was evidence that the promissory note was the city attorney's "interpretation" of the ordinance, it is *the real estate department*,

Was the real estate department's interpretation consistent with the RAP program? ■ "The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.]" *(Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) "If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citations.] Certainly the court is not at liberty to seek hidden meanings not suggested by the statute or by the available extrinsic aids. [Citation.]" *(People* v. *Knowles* (1950) 35 Cal.2d 175, 183 [217 P.2d 1], cert. den. 340 U.S. 879 [95 L.Ed.2d 639, 71 S.Ct. 117]; *Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 186 Cal.App.3d 814, 827 [230 Cal.Rptr. 875].)

■ The ordinance says that increased costs in the form of "monthly loan payments" can be passed on to the tenant after rehabilitation. (§ 32.73, subd. (a).) The words are clear. Adding to them the limiting phrase "to finance rehabilitation" is permitted only if the ordinance, its legislative history or available extrinsic evidence requires it.

The limitation is manifestly not required here. RAP's enabling legislation, the Marks-Foran Act (Act), "was passed as urgency legislation in the fall of 1973 [citation] in order to fill a gap to be created by the federal government's discontinuance of its Federally Assisted Code Enforcement (FACE) program, as the federal government moved away from grants for specific purposes into revenue sharing. [¶] The FACE program, in operation since 1967, had been successful in arresting the decline of several areas in San Francisco as well as in other California communities." *(Board of Supervisors* v. *Dolan, supra,* 45 Cal.App.3d 237, 243, fns. omitted.)

The Act allows local agencies to make long-term, low-interest loans "to finance residential rehabilitation in depressed residential areas in order to encourage the upgrading of property" and predicts that, without local government assistance, "many depressed residential areas will deteriorate at an accelerated pace because property owners are not able to obtain rehabilitation loans from private sources." (Health & Saf. Code, § 37911.) The Act also grants local agencies limited authority to help prevent steep rent hikes that the loans might engender. "A local agency, in order to prevent *precipitous increases in rent which the loans would engender* as to residential rental property, may require, as a condition of making a loan . . ., that the borrower contract during the term of the loan not to raise the rental amount over

---

not the city attorney's office, whose interpretation matters. Only the department was charged with administering the loan program.

an amount which the agency by regulation establishes will yield a fair rate of return for similar investments and will allow for increases that are reasonably necessary to provide and continue proper maintenance of the property." (*Id.*, § 37922.5, subd. (a), italics added.)

We think it crucially significant that the Act empowers the local agency to limit precipitous rent increases that "the loans"—i.e., the agency's *rehabilitation loans*—would engender. That narrow purpose is also reflected in the Act's grant of authority to require advance notice to tenants so that, in the event of tenant protest, "the *amount of rehabilitation work* may, at the discretion of the local agency, *be limited in order to prevent precipitous rent increases* which may cause displacement." (Health & Saf. Code, § 37922.5, subd. (b), italics added.) It is again apparent from the Act's relocation assistance provisions: "[T]he local agency shall take every possible action to prevent displacement of all residents *as a result of the operation of the residential rehabilitation program* .... Such actions shall include relocation payments to persons and families of low or moderate income ... who are tenants displaced *because of ... rent increases resulting from rehabilitation*, ..." (*Id.*, § 37922.2, italics added.)

The RAP ordinance reflects the same narrow scope of rent control. Its general purpose is "to improve the condition of housing and the quality of life in San Francisco by providing a means through which property owners in designated residential areas ... which are deteriorating may obtain financial assistance to rehabilitate their property. It shall be the policy of RAP to maintain the existing diversity of San Francisco's neighborhoods, to encourage the existence of low and moderate income housing, and to preserve the residential character of designated areas." (§ 32.1.) While the general language about maintaining "existing diversity" and encouraging the existence of low and moderate income housing might suggest broad ranging rent control, RAP's specific loan-related sections are designed to limit rent increases *caused by the loan program.* Thus, for example, criteria for deciding whether refinancing of existing debt should be allowed *as part of a RAP loan* include "the need to prevent significant rent increases which would result in a hardship for tenants, and the need to prevent speculators from profiting from the use of residential rehabilitation financing." (§ 32.53, subd. (c).) To be eligible for relocation benefits, tenants must be "displaced by Rehabilitation Assistance Program (RAP) activities ...." (§ 32.90, subd. (a).)

The RAP rules also show concern only for increases caused by the loan. For example, in deciding whether to approve *refinancing as part of the RAP loan,* "[t]he Director [of property for the real estate department] shall be satisfied that an applicant did not purchase or refinance the property with

the intent of using a RAP loan to refinance purchase money debt and consequently improve the applicant's position in acquiring the property." (Rule 7.4.)

The trouble with limiting pass-throughs of preexisting monthly loan payments on the property, of course, is that it does not reduce rent increases *engendered by the RAP loan.* The debt would be there with or without the loan. We have to remember that in 1974, when RAP came into existence, there was no city-wide rent control. A landlord could pass on as much monthly debt service as the market allowed.

We conclude that neither the Marks-Foran Act nor the RAP ordinance was intended to limit pass-throughs of debt service already existing at the time of the rehabilitation loan. It makes good sense that the Legislature and the city's board of supervisors would not want to penalize an owner for using the loan program. One evident purpose of both enactments is to prevent windfall rent increases caused by any sudden appreciation of the improved property, something that could unfairly displace the very residents whose presence was important to retaining the neighborhood's existing character. However, nothing in either enactment convincingly suggests an attempt to interfere with the market forces that brought about any increased value occurring before the RAP loan and resulting rehabilitation. RAP's use of a base rent figure derived from a pre-RAP-designation date does show concern for preventing artificial rises in rental values that mere designation of a RAP area might cause, but section 32.73's cost-of-living adjustment takes care of that by putting a cap on year-to-year increases commensurate with the overall rental market.

Extrinsic evidence in the record buttresses our interpretation of the ordinance as intended to control rent hikes occurring because of RAP-loan rehabilitation work, not preexisting debt service. Judy Teichman, an assistant city attorney involved in negotiations leading to passage of the Marks-Foran Act, also worked with community members and the board of supervisors in drafting the RAP ordinance, especially with its principal author, then-Supervisor John Barbagelata. Teichman explained: "[O]ur assumption was in drafting [section 32.73] that we were not drafting a rent control measure, but that there had been concern in the neighborhood about what the effect might be on the tenants of the program.... There was a lot of activity in the area, a lot of sales and things going on at the time. The concern was that tenants might be forced out as a result of this. The idea was not to make *rent control* but to enact some kind of a measure that would limit the amount by which landlords might raise their rent. [A]nd to allocate any windfall benefits from the activity in the neighborhood that the

program might generate, to the tenants rather than the landlords. [¶] To put it more simply: the idea was to let the landlord pass on any increased costs that they had, but any additional amount that might have been obtainable in the market because of the enhanced neighborhood[,] that would be to the benefit of the tenant." To the extent that Ms. Teichman's comments reflect legislative discussion and events leading to enactment of the ordinance, they illuminate legislative intent. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 769-770 [170 Cal.Rptr. 817, 621 P.2d 856].)

We hold that the rent board correctly allowed the pass-through and that the superior court, in concluding otherwise, improperly interpreted the ordinance. We further hold that the ordinance and its enabling statute simply do not authorize the exclusion of preexisting debt service from the term "monthly loan payments" (§ 32.73, subd. (a)). Thus, to the extent that the superior court was seeking to enforce the promissory note language as a resolution of "ambiguity" in the ordinance, the court erred. The real estate department had no power to exact such a condition.[4]

Our conclusion is bolstered by compelling practical considerations. The success of RAP has depended on owners using the loans. Without that financing, rental housing would have been lost to accelerating deterioration, and many owners could not have obtained or afforded private financing. Ironically, the RAP program's aim of stepped-up code enforcement could have hastened the loss of rental units had the loan program not offered a practical solution for owners caught in the squeeze.

It seems safe to say that many or most of RAP's potential borrowers would have been driven away, as a practical matter, had they been told that existing debt service could not be passed through. Consider this simple illustration:

The base rent date for an apartment in the Upper Ashbury RAP area is July 1, 1973. The rent paid for the unit on that date was $100 a month. This is the "base rent" on which the real estate department calculates the initial

---

[4] We also note that the promissory note is internally inconsistent, leaving room for serious disagreement as to whether it really embodies a promise to pass on only loans related to rehabilitation. The borrower agrees in numbered paragraph 3 of the note to limit rents to increased costs in the form of "loan payments to finance rehabilitation, ...." However, the very next sentence of the same paragraph states: "I agree to abide by the rent increase limitation provisions *as they are set forth in paragraphs (32), (33), (34) of the Deed of Trust securing this note.*" (Italics added.) As we have already noted, paragraph 32 of the deed of trust mirrors the language of the ordinance, "monthly loan payments," without qualification (see fn. 2, *ante*).

maximum rent for the unit at the time the RAP loan is made. This is the case even if the RAP loan is not taken until 1982, for example, and the 1982 tenant is then paying rent much in excess of $100. In 1976, X buys the property, incurring a purchase money mortgage. The pro rata share of the monthly payment assignable to the apartment is $150 a month. In 1978, X secures a RAP loan, the apartment's pro rata share of which is $20 a month. The real estate department, consistent with its interpretation of the term "monthly loan payments," would calculate the initial maximum allowable rent for the apartment this way: $100 (base rent from 1973) plus $150 (monthly mortgage payment) plus $100 (increases in property taxes, insurance, maintenance, etc., plus cost-of-living adjustment, since 1973) plus $20 (RAP loan). The total monthly rent would be $370. However, under respondents' and the superior court's interpretation of the term "monthly loan payments," the $150 for the mortgage payment would be disallowed, leaving a maximum rent of $220, not $370.

Assuming, as we should, that X had at least covered the $150 in his tenant's rent in 1976, plus insurance and other costs, before taking out the RAP loan, the sudden reduction to $220 total monthly rent creates a negative cash flow. Twenty dollars of that amount goes to cover the RAP loan, a cost that he did not have before, leaving only $200 to cover all other costs. His actual costs are $150 (mortgage) plus, in all likelihood, $100 or more in insurance, maintenance, taxes and other costs. He is operating in the red.

Who would be willing or able to take on a RAP loan under those circumstances? Also, the problem is exacerbated if we assume in our hypothetical a purchase date in, say, 1982, when the owner would have paid far more for the property, incurred a greater mortgage, and yet still have been limited to cost-of-living adjustments based on $100. Recall, too, that the prospective borrower could look forward to as many as 20 more years of that formula. Chances are RAP would have had few takers, especially after its first years of operation.[5]

The superior court erred in granting mandate. Contrary to the court's conclusion, the rent board was not acting contrary to law in allowing the

---

[5]The record shows that only the Upper Ashbury and Inner Richmond RAP areas are subject to the section 32.73 rent formula and that the last RAP loans made those areas were in 1984 and 1982, respectively. The issue we confront in this case is thus of limited import, affecting only loans that have been in existence for many years. We assume from the record that the promissory note language at issue here was not used after 1982, which narrows the impact still further.

A decision contrary to our holding could generate many tenant actions for rent rebates as far back as 1974. As a practical matter, however, few tenants would find relief. Rather than rebate exorbitant sums of past rents, most borrowers would probably either flee the program on their own or be forced out. It seems that the only sanction the rent board can impose on an owner who refuses to rebate rents is to terminate the loan. (§ 32.75; rule 7.19, par. 6.)

pass-through. There was thus no abuse of discretion by the agency. (Code Civ. Proc., § 1094.5, subd. (b).)

### DISPOSITION

The judgment granting peremptory writ of mandate is reversed. Appellants shall recover costs on appeal (Cal. Rules of Court, rule 26).

Benson, J., concurred.

**KLINE, P. J.**—I respectfully dissent.

The majority's conclusion—that a property owner participating in the rehabilitation assistance program (RAP) may pass on to tenants monthly loan payments entirely unrelated to rehabilitation of the program—undermines one of the major purposes of the RAP program. This unfortunate conclusion results from a misreading of the Marks-Foran Act and the RAP ordinance, from undeserved deference to the administrative agency and from policy considerations that are unsupported in the record and highly speculative.

### 1.

The ultimate interpretation of a statute or ordinance is an exercise of judicial power and it is the responsibility of the courts to declare its true meaning even where, as is not genuinely here the case, it requires rejection of an earlier administrative interpretation.[1] (*City of Santa Ana* v. *City of Garden Grove* (1979) 100 Cal.App.3d 521, 530 [160 Cal.Rptr. 907]: see also *Cal. Drive-in Restaurant Assn.* v. *Clark* (1943) 22 Cal.2d 287, 294 [140 P.2d 657, 147 A.L.R. 1028].)

The phrase "monthly loan payment" as it appears in the RAP ordinance is in my view ambiguous. Nothing in the ordinance itself explains or, indeed, limits the phrase. Certainly some limitation is required, however, otherwise all a RAP borrower's personal credit expenses, such as the repayment of an automobile loan, could be passed through to tenants—an unreasonable result by any measure. By limiting the phrase "monthly loan payments" to "loan payments to finance rehabilitation" the promissory note clarifies the ambiguity in a manner perfectly consistent with the purposes of both the RAP ordinance and the Marks-Foran Act.

---

[1] As discussed, *post*, at pages 1354-1357 the permissive pass-through practice of the real estate department cannot be elevated to the level of an "administrative interpretation" and is not entitled to judicial deference.

The RAP ordinance, like the Marks-Foran Act and its predecessor, the federally funded federally assisted code enforcement (FACE) program, seeks to achieve the dual purposes of arresting and preventing decay in low and moderate income urban residential areas while maintaining the character of those neighborhoods. In order to avoid the flight of low and moderate income tenants that invariably accompanies gentrification, both the state statute and the local ordinance protect tenants against precipitous rent hikes.

For example, the Marks-Foran Act specifically provides that as a condition of making certain RAP loans, and "in order to prevent precipitous increases in rent," a local agency may require that the borrower agree not to raise rents beyond that necessary to yield a fair return and permit proper maintenance. (Health & Saf. Code, § 37922.5, subd. (a).) The local agency is also empowered to actually limit the amount of rehabilitation work if that proposed by the owner of residential property would engender "precipitous rent increases which may cause displacement." (*Id.*, § 37922.5, subd. (b).)

Such sensitivity to the needs of low and moderate income tenants is similarly apparent in numerous provisions of the RAP ordinance. For example, section 32.1, which declares the purpose of the ordinance, provides that "It shall be the policy of RAP to maintain the existing diversity of San Francisco's neighborhoods, to encourage the existence of low and moderate income housing, and to preserve the residential character of designated areas...." (See also § 32.41, subd. (c), regarding the selection of areas for RAP designation; § 32.53, subd. (c), regarding consideration of the effect on rents and speculation prior to approving refinancing; § 32.69, concerning tenant moving costs and right of first refusal in case of temporary displacement; § 32.73, pertaining to rent increase limitations for RAP areas; § 32.74, establishing rent increase protest procedures; § 32.75, providing sanctions for violation of rent increase limitations; § 32.75-1, setting forth procedures and safeguards in eviction proceedings; and § 32.90, regarding relocation assistance for displaced tenants.) The RAP note itself clearly states that "This loan is made ... for the purpose of achieving the objectives of neighborhood preservation, preservation of low and moderate income housing, and other objectives as are more particularly set forth in these public laws."

My colleagues find the authority for the pass-through to tenants of all preexisting debt in section 37922.5 of the Health and Safety Code, which is set forth in material part in the margin below.[2] According to the majority,

---

[2] Health and Safety Code section 37922.5, subdivision (a): "A local agency, in order to prevent precipitous increases in rent which the loans would engender as to residential rental

this section of the Marks-Foran Act is "crucially significant" because it demonstrates a legislative intent to authorize a local agency to limit only those precipitous rent increases engendered by the RAP loan and deprive it of the ability to limit all other precipitous increases in rent. This interpretation of the statute is much too far a reach.

First of all, as is readily apparent, section 37922.5 more closely resembles a rent control statute than any other provision of the Marks-Foran Act. Since this section of the act does not provide a context in which one would expect to find a major constraint on the ability of the local agency to limit a precipitous rent increase of any sort, it seems reasonable to think that if the Legislature did have that intention it would have included a clear proviso to that effect. There is no such caveat in the statute. Although it acknowledges the obvious fact that RAP loans may engender precipitous increases in rent, section 37922.5 does not make the ability of the local agency to limit rent increases at all depend upon the nature of the debt the landlond attempts to pass-through to tenants; indeed, section 37922.5 does not speak in terms of pass-throughs at all. Regardless of the basis upon which the borrower endeavors to justify a rent increase, the statute simply empowers the local agency to require the borrower to "contract during the term of the loan not to raise the rental amount over an amount which the agency by regulation establishes will yield a fair rate of return for similar investments and will allow for increases that are reasonably necessary to provide and continue proper maintenance of the property." (Health & Saf. Code, § 37922.5, subd. (a).)[3] It is simply unreasonable to discern in this grant of authority a legislative intent to bar the local agency from prohibiting the pass-through to tenants of loans unrelated to rehabilitation. Such a putative intent seems to me not consistent with but *inimical* to the central idea embodied in section 37922.5: that the local agency possesses the power to limit steep increases in rent.

The permissive pass-through of all debt secured by the property means that the amount of rent a tenant will be required to pay will depend heavily on the financing arrangements of the owner of the property. This practice will inevitably result in the manipulation of rents by real estate speculators

---

property, may require, as a condition of making a loan pursuant to this part, that the borrower contract during the term of the loan not to raise the rental amount over an amount which the agency by regulation establishes will yield a fair rate of return for similar investments and will allow for increases that are reasonably necessary to provide and continue proper maintenance of the property. This subdivision shall apply only to structures which will contain 12 or more dwelling units after rehabilitation and to structures for which loans exceeding five thousand dollars ($5,000) per dwelling unit have been extended pursuant to this part."

[3] So far as is shown by the record, the department never by regulation established the amount of rent that will yield a fair rate of return within the meaning of section 37922.5.

and their lenders, who are now provided another reason to heavily leverage the acquisition of rental units in certain areas of the city designated under the RAP program. For such investors the attraction of the RAP program is not that it permits them to finance necessary repairs that could not otherwise be made, as they demonstrably have the ability to obtain commercial loans for that purpose. The value of the RAP program for them is that it provides a loophole in the rent control ordinance. By participating in the RAP program they are free to precipitously raise rents to whatever level is necessary to shift to their tenants the burden of repaying as much debt as their property will secure, regardless of the purpose for which the borrowed funds were obtained or used. To permit this to be done on the basis of section 37922.5—which, as indicated, was intended to authorize the limitation, not the facilitation, of rent increases—seems to me a cruel irony.

The assumption that a fair rate of return cannot be received unless the borrower is permitted to pass-through to tenants all debt secured by the property is not only impossible to reconcile with pertinent case law[4] and with the numerous provisions of the Marks-Foran Act and the RAP ordinance designed to protect tenants, and inconsistent with the very clear language of the promissory note, but as a practical matter is wholly unnecessary to protect landlords. Notwithstanding its rent limitation provisions, the RAP program contains significant incentives for owner participation. First and foremost, the program provides lower than market rate loans to bring property into compliance with mandatory housing code requirements. For some property owners (though obviously not for appellants) the RAP program offers the *only* source of funds for this purpose. In *Board of Supervisors* v. *Dolan, supra,* 45 Cal.App.3d 237, the city advised this court, and we noted, that "as a practical matter, some of the neighborhoods which have been FACE areas or which will be RAP areas have been unofficially "red lined' by lending institutions, and even if funds have been available, they have been available either for shorter than usual periods or for higher than usual interest rates." (*Id.,* at p. 244, fn. 8.)

Although the base rent date of 1973 requires property owners who subsequently obtained RAP loans to roll back rents to those existing in 1973,

---

[4] Federal and state judicial decisions make it abundantly clear that rent limitations such as that set forth in the promissory note do not unconstitutionally deprive landlords of a fair return on their investment. See, e.g., *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644 [209 Cal.Rptr. 682, 693 P.2d 261], affirmed (1986) 475 U.S. 260 [89 L.Ed.2d 206, 106 S.Ct. 1045]; *Fox* v. *San Francisco Residential Rent etc. Board* (1985) 169 Cal.App.3d 651, 658 [215 Cal.Rptr. 565]; *Baker* v. *City of Santa Monica* (1986) 181 Cal.App.3d 972, 978, 980 [226 Cal.Rptr. 755]; *Oceanside Mobilehome Park Owners' Assn.* v. *City of Oceanside* (1984) 157 Cal.App.3d 887, 907 [204 Cal.Rptr. 239]; *Zussman* v. *Rent Control Bd. of Brookline* (1976) 371 Mass. 632 [359 N.E.2d 29, 33-34]; *Troy Hills Village* v. *Township Council* (1975) 68 N.J. 604 [350 A.2d 34, 47].

generous cost-of-living adjustments cushion the impact to property owners to a substantial degree. Thus, for example, appellants were initially allowed an 82.7 percent cost-of-living increase over 1973 rent levels , in addition to actual increased maintenance, insurance, and tax costs, and the cost of the RAP loan. If such expenses and the cost-of-living increase, as is likely, additional adjustments will periodically be allowed. It is true that the RAP borrower is subject to "vacancy control" during the term of the RAP loan; that is, the rents could not be increased solely due to the change of tenants. Nevertheless, borrowers may in effect "buy out" of the RAP program rent limitations by prepaying the RAP loan without penalty. (§ 32.62.) Finally, if 1973 base rents were unreasonably low, or nonexistent, RAP rule 7.19, paragraph 2(A) allows the owner to "petition the Director to establish a base rent or to review the base."

For the foregoing reasons, limiting pass-throughs to "loan payments to finance rehabilitation," as prescribed in the promissory note, would not eliminate the incentive for property owners to participate in the program or otherwise obstruct its goals.

The interpretation urged by the city and endorsed by the majority— which allows landlords to pass-through *any* debt secured by the property— is far more difficult to reconcile with the purposes of the RAP program. The real estate department would allow rent increases to cover monthly payments on loans incurred not only for the purpose of acquiring property, but to finance a college education for the owners' children, a gambling trip to Reno, or any other interests or investments of the borrower. The sole inquiry the department thinks necessary is whether the loan was secured by the property. The authorization of rent increases for these purposes, which for properties such as the one involved in this case would otherwise be barred by the rent control ordinance,[5] will induce wealthy property owners to participate in the RAP program who do not really need its benefits. This will defeat the goals of the program by diverting and depleting the limited public funds available to improve deteriorating urban housing.

Permitting pass-throughs to tenants of any debt secured by the property is also hard to square with language in the RAP ordinance which alerts those who administer the program to "the need to prevent speculators from profiting from the use of residential rehabilitation financing." (§ 32.53.) Judicial acceptance of the city's permissive practice converts the RAP program into a highly attractive device for increasing rents and accelerating the

---

[5] The provision in the RAP ordinance prohibiting rent increases that exceed those permitted under the rent control ordinance only applies to RAP areas designated on or after July 1, 1977. (See § 32.73-1.)

departure from gentrified areas of the low and moderate income tenants the program was conceived in large part to protect. In effect, the majority permit rents to be set by the very speculators against whom tenants were supposed to be protected.

2.

The linchpin of the majority opinion is its deference to the "administrative interpretation" of the RAP ordinance by the real estate department and the claimed acquiescence in that "interpretation" by the board of supervisors. The majority suggests that the department's loan officers consistently explained to prospective borrowers that all preexisting debt service could be passed through, not just RAP payments or other rehabilitation-related payments, and the department always allowed such pass-throughs. Therefore, the majority concludes, borrowers "obviously" must have relied on such pass-throughs. (Maj. opn., p. 1343.)

This view of the facts is not supported by the record. There is no evidence loan officers told borrowers all debt service could be passed through to tenants; nor is there evidence that any borrower relied on such advice.

John Rathsam was the only loan officer to testify in any of the proceedings below. Nowhere in his testimony does Mr. Rathsam ever say he affirmatively told any borrower, let alone all prospective borrowers, that it was permissible to pass-through debt service on loans unrelated to rehabilitation. All Mr. Rathsam stated in this regard was that he never told a borrower it was impermissible to do so. In other words, since the witness never states whether any borrower ever inquired about the matter, the only inference that can safely be drawn from the record is that Mr. Rathsam never gratuitously advised a borrower that the pass-throughs in question were permissible; and we cannot be certain that he ever gave this advice to a single borrower.

The majority states that appellant Richard Klein was told by loan officer Soo Hoo, who did not himself testify, "that the costs of the purchase money mortgage could be passed along to tenants as " 'monthly loan payments.' " (Maj. opn., p. 1340.) Mr. Klein's actual testimony, though self-serving, is by no means so clear. When asked whether Mr. Soo Hoo or anyone else from the department told him that all loan increases could be passed through into the RAP program, Mr. Klein responded "I sat with Mr. Soo Hoo for some time and he explained to me the program in some depth and I think just the way Mr. Rathsam described it to you." When pressed further by his counsel as to whether Mr. Soo Hoo actually stated that permissive pass-throughs

were the policy of the RAP program, Klein replied that "I—I certainly had the impression that this had been the on-going program in terms of what he presented. He's a very competent man."

Though the record does not establish that borrowers were invariably induced to believe they could pass-through nonrehabilitation loans, it does establish that the department never considered this legal question.

When asked when he found out about the language of the note, Rathsam, who appears to have been the most experienced loan officer, replied that "To be honest with you it was brought out embarrassingly enough by some attorney checking over, I think in the Dodson case. We went on an assumption that they [i.e., the terms of the ordinance and those of the note] were one and the same all these years. I admit to that. Once that was turned over to the City Attorney's office I never bothered to sit down and read the terms of the promissory note. I might have even overlooked the words." In short, it was not until the *Dodson* cases were filed in 1983—nearly a decade after the RAP program was first established in San Francisco, and one year after appellants became participants in the program—that representatives of the real estate department realized that the terms of the promissory note which they provided restricted pass-throughs to "loan payments to finance rehabilitation."

It deserves to be emphasized at this point that the language in question was not obscure either in its meaning or its placement in the two-page promissory note. At the top of the note in boldface type appeared the following warning: "NOTICE TO BORROWER: THIS DOCUMENT CONTAINS PROVISIONS FOR A VARIABLE INTEREST RATE, *FOR RENT INCREASE LIMITATIONS*, FOR TENANT'S RIGHT OF FIRST REFUSAL TO REOCCUPY, FOR OPEN HOUSING AND FOR EQUAL EMPLOYMENT OPPORTUNITY IN EMPLOYMENT OF CONTRACTORS AND SUBCONTRACTORS." (Italics added.) Thus, even if it be assumed for the sake of argument that a borrower was told that all pass-throughs were permitted, and that he or she relied on that representation, the reasonableness of such reliance seems highly questionable in light of the unambiguous language to the contrary contained in the note and highlighted. It is pertinent, in this regard, that appellants, like most RAP borrowers, were owners of multiunit residential properties who cannot be assumed to be unsophisticated. (Cf. *Easton* v. *Strassburger* (1984) 152 Cal.App.3d 90, 102, fn. 8 [199 Cal.Rptr. 383, 46 A.L.R.4th 521].) They knew or should have known the legally binding nature of a promissory note, and they read or should have read the document they signed; it works no injustice to hold them to its clear conditions, as required by the ordinance.

Though the record leaves considerable doubt whether RAP borrowers were told that all debt could be passed through to tenants and relied on such information, it leaves no doubt borrowers were provided the opposite advice, for the real estate department provided the promissory note to all borrowers and required them to sign it. The fact that the loan officers who provided the note did not read it does not mean those who signed and were bound by the document failed to so or should be excused from that fundamental responsibility. The RAP ordinance specifically provides that as a condition of participating in the program, a borrower "shall agree to all conditions of the loan agreement . . . ." (§ 32.60, subd. (a).) The real estate department failed to enforce the condition at issue in this case, and therefore failed as well to enforce the RAP ordinance, due to its ignorance of the fact that the condition existed. In countenancing this failure of enforcement the majority does not have even that weak excuse.

There is no basis in the record of this case to conclude that the board of supervisors acquiesced in the pass-through to tenants of nonrehabilitation loans. The issue was never raised in any public forum until the *Dodson* cases were filed. There is no reason to presume that before then the board knew the department's practice or had reason to believe it differed from that prescribed in the promissory note prepared by the city attorney.

While it is true that the superior court's opinion in the *Dodson* cases is not precedent binding upon us, the failure of the city to appeal that decision certainly indicates that, in the event they were at all aware of the issue, responsible city officials understood that the court's order would apply to all RAP loans, such as the one before us, that were outstanding at the time the *Dodson* cases were decided. The fact that the board of supervisors amended the RAP ordinance on several occasions after the decision in the *Dodson* cases without explicitly authorizing permissive pass-throughs certainly does not indicate acquiescence in that policy.

The principle that the construction of a statute by an administrative agency charged with its administration is ordinarily entitled to great weight and should be respected by the courts is improperly invoked in this case for several reasons. Chief among them, however, is that there never was an "administrative interpretation" to which great weight can be attached. In reality, the so-called "administrative interpretation" to which my colleagues pay homage is nothing more than a post hoc rationalization fashioned by the city attorney as legal argument to justify the incompetence of embarrassed loan officers in the department of real estate. My colleagues' deference to this argument perverts the principle of statutory construction they purport to rely upon; for it results in the shielding from close judicial

scrutiny of an administrative practice that was carried out in ignorance rather than as the result of any considered contemporaneous construction of the ordinance and the implementing note.

### 3.

The majority claims "that many or most of RAP's potential borrowers would have been driven away, as a practical matter, had they been told that existing debt service could not be passed through." (Maj. opn., p. 1347.) In effect acknowledging that there is no support for this statement in the record, the majority concocts an elaborate hypothetical situation to ostensibly prove its point. The critical assumptions upon which it is based are so manifestly unwarranted, however, as to reveal the weakness of the case the hypothetical purports to make.

The hypothetical posits a 1973 base rent of $100 which, even with periodic adjustments, is assertedly too low to permit the servicing of the debt incurred to acquire the property. Preliminarily, such a predicament is uncommon, because responsible real estate investors ordinarily do not acquire properties that do not generate a cash flow adequate to support the purchase money mortgage, particularly in a city like San Francisco with a rent control ordinance that prohibits the pass-through of such debt. (Rules & Regs., S.F. Residential Rent Stabilization Bd., § 6.10.)[6] In any event, given the problem of a base rent that is unreasonably low, the property owner's recourse is to seek to have it revised. As already indicated, the RAP rules provide that "if the owner believes that the rent charged on the base rent date was unreasonably low" he or she may petition to have the base rent increased. (RAP rule 7.19, ¶ 2(A).) The rules indicate such upward revision should be allowed if the base rent was materially lower than that charged for comparable units within the same building or in the immediate neighborhood or "any special or unusual circumstances affect[ed] the rent charged on the base rent date." (*Ibid.*) In other words, the RAP program

---

[6]The rules and regulations that implement the rent control ordinance permit such debt to be passed through only in instances in which the owner acquired the property for a price which exceeds the seller's purchase price by "[less] than the percentage increase in the [consumer price index] between the date of previous purchase and the date of current sale plus the cost of capital improvements rehabilitation and/or energy conservation work made or performed by the seller." (*Id.*, § 6.10 (d).) The rules also provide that "an increase in debt service as a result of refinancing to obtain funds in excess of existing financing, will only be considered as a justification for a rent increase if the proceeds of the borrowing are reinvested in the building for purposes of needed repairs and maintenance, or capital improvements which increase the quality of the rental units." (*Id.*, § 6.10 (e).)

includes an administrative procedure for addressing the problem conjured by the majority.[7]

The majority's hypothetical is artificial for yet another reason. The majority assumes a 1973 base rent of $100, and that the new owner's actual monthly costs include $150 for the mortgage payment and $100 or more in "insurance, maintenance, taxes and other costs." (Maj. opn., p. 1348.) The majority further assumes that the total upward adjustment in rent that would be allowed for "increases in property taxes, insurance, maintenance, etc. plus cost-of-living ... since 1973" is $100. (Maj. opn., p. 1348.) This latter assumption grossly understates the magnitude of the generous adjustments that have actually been allowed under the RAP program. As earlier noted, for example, two years after they acquired the property, appellants were allowed an 82.7 percent increase over the base rent just to reflect the increase in the cost of living, leaving aside additional increases allowed as adjustments for increased taxes, insurance, maintenance and other costs, including the cost of the RAP loan, and leaving aside subsequent adjustments allowed for any further increases in such expenses and in the cost of living.

In short, the majority's hypothetical case is a chimera. The extent to which it distorts reality is dramatized by the fact that in 1982 appellants increased respondent Anderson's rent by 70 percent over the amount charged the previous year. If appellants had not been participating in the RAP program the maximum increase they would have been allowed under the rent control ordinance, which would then apply, was 7 percent.

The hypothesis contrived by the majority is unjustified not only because it ignores the generous adjustments that cushion the impact on landlords of the RAP rent limitation provisions, and the fact that the RAP program is far more magnanimous to appellants than the rent control ordinance that would otherwise apply, but because there is absolutely no evidence of which this court may properly take notice that the inability of property owners to pass-through all preexisting debt secured by the property would have "driven away" any potential borrowers. To the extent the record contains any evidence bearing upon the economic impact of pass-through policy it suggests that the permissive policy that has been in effect has been used by

---

[7] It deserves to be noted, in this connection, that appellants never pursued this administrative remedy and never demonstrated, if indeed they could, that the RAP rent limitations created a negative cash flow or otherwise denied them a fair return on their investment. I do not understand why the majority is willing to assume that which appellants failed to show, as it seems to me much more appropriate to assume the opposite.

property owners to improperly exploit tenants; i.e., that some property owners are participating in the RAP program not because they are otherwise unable to rehabilitate their property but because they are otherwise unable to increase their rents. As the majority points out, "[t]he [*Dodson*] cases evidently involved property owners who refinanced their property to the hilt just before taking out a RAP loan, planning to take advantage of the pass-through and perhaps to avoid the rent control ordinance, which exempts RAP-loan property in RAP areas designated before July 1977." (Maj. opn., p. 1342.) Similarly, in the instant case appellants used a purchase money mortgage in the amount of $125,000 to finance more than 70 percent of the cost of acquiring property which, because it was also located in a RAP area designated prior to 1977, was exempted from rent control if the owner participated in the RAP program. Therefore, by obtaining a RAP loan in the relatively small amount of $7,100, appellants were able to evade the rent control ordinance and pass-through to their tenants most of the cost of acquiring the property.

By ignoring one of the critical provisions of the promissory note (which pursuant to the RAP ordinance every borrower is required to agree to) my colleagues have created a danger far more likely to materialize than the one they imagine.[8] This danger—the flight of low and moderate income tenants from rehabilitated areas of the city as a result of precipitous rent increases— is one the RAP program was designed to avoid.

For the foregoing reasons, I would affirm the judgment.

A petition for a rehearing was denied July 24, 1987. Kline, P. J., was of the opinion that the petition should be granted. Respondents' petition for review by the Supreme Court was denied October 29, 1987. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.

---

[8] The majority assumes that the issue in this case is "of limited import" because RAP loans are not currently being made. However, the RAP ordinance and the implementing rules and regulations are still in effect and new loans can be made at any time.